**SO ORDERED.**

**SIGNED this 03 day of November, 2009.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# WILSON DIVISION

| | |
|---|---|
| **IN RE:** | |
| **SHEARIN FAMILY INVESTMENTS, LLC,** | Case Number: 08-07082-8-JRL |
| | Chapter 11 |
| Debtor. | |
| | |
| **CENTURION CONSTRUCTION COMPANY, INC.,** | Adversary Proceeding Number: |
| Plaintiff, | 09-00051-8-JRL |
| vs. | |
| **RBC REAL ESTATE FINANCE, INC.,** | |
| Defendant. | |

## ORDER

This case is before the court on the defendant's motion to dismiss counts 3, 5, 6, and 8 of the adversary proceeding. A hearing took place in Raleigh, North Carolina on September 21, 2009.

## JURISDICTION AND PROCEDURE

This court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), which this court may hear and determine.

## FACTS[1]

On June 22, 2006, the plaintiff, Centurion Construction Company (hereinafter "Centurion"), contracted with Shearin Family Investments, LLC (hereinafter "Shearin") for the construction of the Nautical Club (hereinafter "the project").  Before beginning to work, Centurion required a commitment letter stating that the project was funded, which was provided by the defendant, RBC Real Estate Finance, Inc. (hereinafter "RBC"), on August 22, 2006.  After receiving the commitment letter, Centurion began work on the project.

From the outset, Centurion was not paid in a timely manner and was in direct communication with RBC regarding its concerns about the untimely payments.  On March 19, 2007, Centurion met with Shearin and RBC to discuss the payment problems, at which time both RBC and Shearin assured Centurion that its contract with Shearin would be fully performed and that the construction loan was forthcoming.  After Centurion requested additional assurance that its contract with Shearin would be fully funded, RBC provided Centurion with a second commitment letter in April of 2007.

---

[1] For the purpose of this motion to dismiss for failure to state a claim, the court accepts as true and views in the light most favorable to the plaintiff all of the allegations pleaded in the complaint.  See, e.g., Hatfill v. New York Times Co., 416 F.3d 320, 329 (4th Cir. 2005).

In August and September of 2007, RBC contacted Centurion and requested that Centurion execute "consent" documents for the loan paperwork, which Centurion provided. RBC also required Centurion to subrogate all of its statutory lien rights on the project to RBC's Deed of Trust. Payments continued to lag, and in September of 2007, Centurion advised Shearin that it would stop work on the project if payment was not forthcoming. In response, RBC and Shearin jointly represented to Centurion that the loan closing would take place in October. Shearin and RBC entered into the loan agreement in October of 2007; Centurion was not a party to the loan agreement.

Prior to closing the construction loan, RBC required a copy of the construction contract between Shearin and Centurion, which incorporated a schedule of values requiring the project architect to certify pay applications based on certain construction milestones. Immediately after the loan closing, RBC began making improper deductions from Centurion's architect certified pay applications and funds were not disbursed according to the terms of the construction contract. RBC did not inform Centurion that it was using an alternate schedule of values. In June of 2008, Centurion discovered that RBC had created a separate schedule of values that it was using to determine the amount funded to Centurion for each pay application. Within a month, payments to Centurion ground to a halt. Realizing that Shearin was having great financial difficulties, Centurion sent a letter to Shearin threatening to shut down work on the project because it was not being paid. When Centurion informed RBC of this intention, RBC asked Centurion to remain on the project, suggesting that funds were forthcoming.

Shearin did not pay Centurion in July or August of 2008. Over the next few months RBC, Shearin, and Centurion negotiated as to whether Centurion would continue work on the

project and whether Shearin would be able to pay Centurion.  On October 13, 2008, Shearin filed for Chapter 11 bankruptcy protection.  By November, Centurion had notified RBC that its subcontractors were starting to abandon the project due to nonpayment.  RBC told Centurion that it was merely waiting for court approval and sewer easements from the county, insinuating that it would resume funding of the project at that time, and requesting Centurion to continue work on the project.  Centurion agreed to continue working and wait for payment until December 4, 2008.  On that date, counsel for RBC emailed Centurion, indicating that Centurion and its subcontractors would be paid, and asking Centurion to inform RBC if subcontractors left the job so that RBC could mitigate damages.  Over the next month RBC and Centurion were in constant communication regarding amounts owed to Centurion that had been withheld by RBC and payment of those amounts.  RBC did not pay these amounts to Centurion, and Centurion left the project.  On January 13, 2009, RBC filed an adversary proceeding and request for injunctive relief, requesting the court to order Centurion to resume work on the project without payment.  The court denied this request.  To date, Centurion has not been paid in full for its work on the project.

## STANDARD OF REVIEW

A pleading which states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  FED. R. CIV. P. 8(a)(2); FED R. BANKR. P. 7008.  In determining whether the plaintiff has failed to state a claim upon which relief can be granted, the court must accept as true all pleaded allegations and view the complaint in the light most favorable to the plaintiff.  Hatfill v. New York Times Co., 416 F.3d 320, 329 (4th Cir. 2005).  Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as adopted by the Federal

Rules of Bankruptcy Procedure, a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6); FED R. BANKR. P. 7012(b). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citations and quotations omitted). Heightening pleading requirements under the Federal Rules of Civil Procedure, the Supreme Court held that a statement showing entitlement to relief "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. A claim is facially plausible when the facts alleged in the complaint allow the court to draw a "reasonable inference" that the defendant is liable for the alleged misconduct. Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'shown' - 'that the pleader is entitled to relief.' " Id. at 1950 (citation omitted).

## ANALYSIS

**1. Tortious Interference with Third Party Contract (Count 5) and Loss of Anticipated Profits (Count 8)**

The plaintiff did not respond to the allegations in the defendant's motion to dismiss regarding Counts 5 and 8 of the complaint. At hearing, the parties agreed that the plaintiff's claims for tortious interference with a third party contract and loss of anticipated profits have been abandoned, and thus are hereby dismissed.

**2. Breach of Fiduciary Duty and Constructive Fraud (Count 3)**

Breach of a fiduciary duty can only occur within the bounds of a fiduciary relationship. See, e.g., Dalton v. Camp, 353 N.C. 647, 654, 548 S.E.2d 704, 707 (2001). Courts in North

5

Carolina have been hesitant to define " 'the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded.' " Frizzell Constr. Co. v. First Citizens Bank & Trust Co., 759 F. Supp. 286, 290 (E.D.N.C. 1991) (quoting Abbit v. Gregory, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)), aff'd per curiam, 972 F.2d 339 (4th Cir. 1992). However, the term "fiduciary relationship" has been broadly defined by the North Carolina Supreme Court as one " 'where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.' " Volumetrics Med. Imaging, Inc. v. ATL Ultrasound Inc., 243 F. Supp 2d 386, 404 (M.D.N.C. 2003) (quoting Abbit, 201 N.C. at 598, 160 S.E. at 906).

    Fiduciary duties always arise from certain legal relationships, but may also arise outside the legal setting in situations which are " 'moral, social, domestic, or merely personal.' " Frizzell, 759 F. Supp. at 290 (quoting Abbit, 201 N.C. at 598, 160 S.E. at 906-07). North Carolina recognizes two broad categories of fiduciary relationships:

> 1) those that arise from legal relations such as attorney and client, broker and client . . . partners, principal and agent, trustee and cestui que trust," and 2) those that exist "as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.

Id. Absent "special circumstances" causing one party to have "superiority and influence" over the other, no fiduciary relationship can exist between "mutually interdependent businesses with equal bargaining positions who dealt at arms-length." Smith v. GMAC Mortgage Corp., No. 5:06CV125-V, 2007 WL 2593148, 5, 2007 U.S. Dist. Lexis 66001, 15 (W.D.N.C. 2007) (quoting Rhone-Poulenc Argo S.A. v. Monsato Co., 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999) (internal quotations omitted)). When the situation does not cleanly fit into a previously defined category, the question whether a fiduciary relationship exists is a determination for the finder of

fact and depends ultimately on the specific facts and circumstances of the case. Id., Lexis 66001 at 16-17.

The defendant relies on two cases to support its absolute assertion that no fiduciary relationship can exist between a lender and its borrower's third party general contractor absent an express contract between the lender and the contractor. In Carlson v. Branch Banking and Trust Co., 123 N.C. App. 306, 315, 473 S.E.2d 631, 637 (1996), the Court of Appeals for North Carolina held that "any duty on the part of a commercial lender to a guarantor to monitor the use of loan proceeds by a borrower, must arise through contract." One year later, the court extended the Carlson holding to construction lending in Perry v. Carolina Builders Corp., 128 N.C. App. 143, 150, 493 S.E.2d 814, 818 (1997). In both Carlson and Perry, the court found that the plaintiff's reliance on purpose statements in the loan documents was insufficient to create a fiduciary relationship, holding that "[p]urpose statements are permissive and merely describe what the borrower may do with the money rather than giving rise to a lender's affirmative duty to a third party." 123 N.C. App. at 314, 473 S.E.2d at 636; 128 N.C. App. at 149, 493 S.E.2d at 818.

While the defendant is correct in asserting that no North Carolina court has identified a fiduciary duty owed by a lender to its borrower's third party general contractor, absent a contractual agreement between the lender and contractor, North Carolina law does not preclude such a result. In Frizzell Construction Co. v. First Citizens Bank & Trust Co., the court upheld the jury's finding that First Citizens Bank, trustee under a mortgage indenture agreement with bondholders of the financing corporation, owed a fiduciary duty to the construction project's third party general contractor with regards to fund disbursement on the construction project. 759

7

F. Supp. at 290. The court found that the First Citizens bank owed a fiduciary duty to the third party general contractor, Frizzell Construction Company, because "Frizzell reposed confidence in First Citizens that it would have funds to pay for construction of the project and First Citizens was in a position of superiority to manage the money in the fund." Id. at 291.

The defendant argues that Frizzell is limited to its facts, based on First Citizen's position as trustee under the indenture agreement it entered with the bondholders of the corporation, or, in the alternative, that it was superseded by Carlson and Perry. The court disagrees and finds that it is bound by the Fourth Circuit's decision in Frizzell. First Citizen's role as trustee created a fiduciary relationship between itself and the bondholders, but that relationship could not extend to the general contractor absent additional circumstances creating a relationship of trust whereby the contractor acted in reasonable reliance on the bank's promise that adequate funds were available to pay for its work on the project. Carlson and Perry did not expressly overrule Frizzell; these cases can be reconciled by acknowledging that absent special circumstances causing one party to have superiority and influence over the other, no fiduciary relationship can arise between a lender and its borrower's third party general contractor in the absence of an express contract between the lender and contractor.

The particularity requirement for a cause of action for constructive fraud based on fiduciary duty is met by alleging facts and circumstances

> 1) which created the relation of trust and confidence, and 2) led up to and surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.

Frizzell, 759 F. Supp. at 291-92 (quoting Watts v. Cumberland County Hosp. System, Inc., 317 N.C. 110, 343 S.E.2d 879 (1986)) (quotations omitted). In the complaint, the plaintiff alleges

8

that the defendant created a relationship of trust and confidence by making repeated oral and written assurances directly to the plaintiff that the project was fully funded, and that the plaintiff should not leave the project for non-payment as payment was forthcoming.  This allegation is supported by extensive details throughout the complaint regarding the extra-contractual relations between the plaintiff and the defendant.  Furthermore, the complaint asserts that the defendant bank was in a position of superiority and influence because it was responsible for managing the money in the fund and for releasing that money to pay the plaintiff for its work on the project.  The circumstances which led up to and surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff are also set forth in great detail.  The facts alleged in the complaint, viewed in the light most favorable to the plaintiff, are such that a reasonable finder of fact could find the existence of a fiduciary relationship between the plaintiff and the defendant, and breach of that duty by the defendant.

### 3.  Third Party Beneficiary Breach of Contract (Count 6)

To state a prima facie claim for breach of contract as a third party beneficiary, the allegations in the complaint must be sufficient to allow the court to draw a reasonable inference that the plaintiff was intended to be a third party beneficiary at the time the contract was made. In order to establish a claim as a third party beneficiary under North Carolina law, the plaintiff must show

> (1) that a contract exists between two persons or entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for the direct, and not incidental, benefit of the plaintiff.  A person is a direct beneficiary of a contract if the contracting parties intended to confer a legally enforceable benefit on that person.  It is not enough that the contract in fact, benefits the plaintiff, if, when the contract was made, the contracting parties did not intend

it to benefit the plaintiff directly.

Holshouser v. Shaner Hotel Group Props. One Ltd. P'ship., 134 N.C. App. 391, 399-400, 518 S.E.2d 17, 25 (1999), aff'd, 351 N.C. 330, 524 S.E.2d 568 (2000) (citations and quotations omitted). In North Carolina, contracts "must be construed strictly " against plaintiffs seeking enforcement as third party beneficiaries. Id. at 400, 518 S.E.2d at 25. Thus, the allegations in the complaint must be sufficient to overcome a presumption that the contracting parties did not intend to confer a legally enforceable benefit on the plaintiff.

To determine the contracting parties' intent, the court "should consider the circumstances surrounding the transaction as well as the actual language of the contract." Washington Square Securities, Inc. v Aune, 253 F. Supp. 2d 839, 843 (W.D.N.C. 2003) (citing Holshouser 134 N.C. App. at 400, 518 S.E.2d at 17). The fact that a person is designated as a beneficiary in the contract serves as evidence that such person was intended to be a direct beneficiary at the time of contract formation. Revels v. Miss Am. Org., 182 N.C. App. 334, 336, 641 S.E.2d 721, 723 (2007). As the terms of the contract are not available to the court for review, the court's determination must be based solely on the circumstances surrounding the transaction as alleged in the complaint.

Centurion argues that regardless of the contract's terms, the defendant's actions make it clear that the funds were intended for the use and benefit of Centurion. However, these allegations merely establish that Centurion would, in fact, benefit from performance of the contract. Without further allegations indicating that Shearin and RBC intended to confer a legally enforceable benefit on Centurion at the time they entered into the lending contract, Centurion has not "shown" that it has a valid claim for breach of contract as a third party

beneficiary.

The plaintiff cites James River Equipment, Inc. v. Tharpe's Excavating, Inc., 179 N.C. App. 336, 343, 634 S.E. 2d 548, 554 (2006) in support of its assertion that a general contractor may be a third party beneficiary to a lending agreement between a developer and its lender. However, the instant case is distinguishable.  In James River, the court found that a subcontractor was the direct beneficiary to a contract between the project's general contractor and the owner based on a statute which provided that the contractual bond requirement was "clearly and explicitly for the direct benefit of laborers and subcontractors." 179 N.C. App. at 343, 634 S.E.2d at 554 (relying on N.C. Gen. Stat. § 44A-26(a)(2), which provides that in state construction contracts "[t]he payment bond shall be solely for the protection of the person furnishing materials or performing labor for which a contractor, subcontractor, or construction manager at risk is liable").  There is no such statute operating in these circumstances that would make the plaintiff a direct beneficiary to the lending agreement between the debtor and the defendant.

## CONCLUSION

Based on the foregoing, the defendant's motion to dismiss is DENIED as to count 3 for breach of fiduciary duty and constructive fraud, and GRANTED as to count 5 for tortious interference with a third party contract, count 6 for third party beneficiary breach of contract, and count 8 for loss of anticipated profits.

**"END OF DOCUMENT"**